HEARD APRIL TERM, 1879.

CASE No. 763.

J. H. BROOKS, EXECUTOR OF WHITFIELD BROOKS, AND OF MARY P. BROOKS, v. M. C. BROOKS ET AL.

M. C. BUTLER, ASSIGNEE, v. J. H. BROOKS, EXECUTOR, AND J. C. BROOKS.

1. A testator, by his last will, declared: " All and singular the rest and residue of my estate, both real and personal, of every description, I give devise and bequeath to my beloved wife, M., for and during the term of

her natural life; and, after her death, it is my will and desire that the same shall be sold and the proceeds thereof equally divided among my children in fee, share and share alike." Other provisions of the will clearly showed that the sale of this residuum was not to take place until after the death of M. *Held,* that the estate was to be enjoyed specifically in mass by M. during her life.

2. In such case the only duty of the life-tenant is to maintain and preserve the estate as a whole, in as good condition as to productive capacity as when received, and she is not responsible for deterioration occurring without fault on her part. *Cases considered.*

3. Hence, a sale of two slaves, a small proportion of the estate, by such a life-tenant, is not improper.

4. The burden of proof rests upon the remaindermen to show deterioration, improperly permitted, in the value of furniture and like property in the hands of the life-tenant.

5. The consumable or vendable products of such life-estate, over and above what are needed for the current support of the property, should, when adequate, be applied to the reasonable maintenance of the life-tenant, and to maintain the estate in as good condition as when received; when inadequate, they should be applied equally to the maintenance of the life-tenant and of the estate. *Cases considered.*

6. Of the produce on hand at death of testator, such as is proper to be consumed for the benefit of the estate is properly only a part of the estate, to be accounted for as a whole by the life-tenant; a surplus of such produce not so needed, is to be accounted for as of its pecuniary value at testator's death. Property not consumable is to be regarded as a specific bequest, to be preserved in proper condition for the remaindermen. *Cases considered.*

7. Where a life-tenant dies before the agricultural year is completed, the produce of such year belongs to her estate, subject to her accountability for the life-estate.

8. In the absence of special circumstances warranting a charge upon the estate by a life-tenant, money expended by her therefor cannot be made a claim against the estate.

9. Permanent improvements put upon land by a life-tenant, are to be considered under the general question of the condition of the estate as a whole, and cannot be otherwise made a charge against the estate.

10. A life-tenant, who was also executrix, receiving the residuum of an estate, is entitled to credit for a debt of testator paid out of her individual property, but not to interest thereon.

11. A life-tenant, who is also executrix, is not bound to return an inventory of the property held by her in her character of life-tenant.

12. Where an executor has an election to take a tract of land at a valuation, and doubts as to the construction of the will and the mode of valuation require a determination by a court of equity, the executor may await the decree before making his election, and may, meantime, retain the land in his own possession, and should be charged therefor only a fair rental value, and should not be held accountable for the profits derived from its use.

13. Where the court is asked to construe a will, it is competent to require, by decree, that releases should be executed by the legatees according to the direction of the will, before receiving their legacies.

14. Where land is given to A for life, and after her death to be sold, and the proceeds divided amongst testator's children, share and share alike, a judgment obtained against one of these children during the lifetime of A, constitutes no lien upon his share in the remainder; and when sold under the direction of a court of equity, the share of such child in the proceeds, passing under an assignment, previously executed for the benefit of his creditors, will be regarded as equitable assets.

15. Equity will enforce the terms of an assignment for the benefit of creditors, although not legally complete under the act of 1759, by reason of the failure of the assignee to accept the trust. Creditors in interest may seek the aid of a court of equity to enforce its terms, and the statute of limitations is no bar to the trust thus created.

16. Where an assignment made under the act of 1759 for the benefit of creditors, fails to convey the legal title for want of acceptance by the assignee of his trust, a subsequent assignment of a portion of the same property to others, will be upheld, the validity of such second assignment not being made a question in the cause.

17. Under a bill which cannot be regarded as a general creditors' bill, as the legal remedies were not exhausted, but retained as a bill to carry out the trusts of an assignment, the plaintiffs have no right to have the interests of the debtor in property not embraced in the assignment, defined.

18. A payment of a portion of the assigned estate to one who had made an assignment for the benefit of his creditors, under the act of 1759, sustained, as, the assignee having refused to accept the trust, there was no one else to whom payment could be made.

19. When property at a fixed valuation is offered by the will to one of the children of testator, the decree which declares the right of such child to this property should, at the same time, provide for equalization of shares among all the children, as contemplated in the will.

20. The gift by a mother to her son, during her last illness, of a certificate of deposit, payable to bearer, upheld as a *donatio causa mortis*.

21. An executor is not responsible for failing to collect a note of the estate from a party proved to have been insolvent.

22. An executor is not entitled to commissions for years in which he filed no returns.

23. This court will direct a decree to be opened to enable the Circuit Court to correct a clerical error.

24. Allowance of counsel fees to an executor is a matter within the discretion of the Circuit judge; and the refusal of one judge, at an early stage of a cause to allow them, cannot control the judgment of another judge who finally hears the cause.

25. Where questions of doubt prevent an executor from lending or paying out the moneys of the estate, he should not be charged with interest until the end of a year after his qualification.*

* See *Koon* v. *Munro,* (4), 11 *S. C.* 140.

Before Carpenter, J., December, 1875, and Pressley, J., October, 1878, at Edgefield.

In the action first above stated, John Hampden Brooks, as executor of the will of his father, Whitfield Brooks, and as executor of his mother, Mary P. Brooks, asked for a construction of both wills, and the instruction of the court as to the several questions arising thereunder. All other parties in interest were made defendants, who by answer demanded an accounting of both estates. This action was commenced in 1871.

The second action was instituted in 1872 by M. C. Butler, assignee, and others creditors of James C. Brooks, a son of Whitfield and Mary P. Brooks, against James C. Brooks, J. Hampden Brooks, executor, and W. P. Butler—the last-named having been named as assignee under an assignment for the benefit of creditors, but who refused to act. This action claimed the benefit of the assignment made by James C. Brooks of his interest in the estate of his father after the termination of his mother's life estate therein, and demanded an accounting by J. H. Brooks, executor, and the payment to them of J. C. Brooks' interest.

Whitfield Brooks died in 1851, leaving of force a last will and testament. After making some specific bequests, the will proceeds:

9. If any one or more of the negro slaves hereby specifically bequeathed to my beloved son, John Hampden Brooks, shall die before he has attained to the age of twenty-one years, the loss of the slave or slaves so dying during the minority of the said John H. Brooks, shall be made up to him by substituting in the stead of the slave or slaves so dying another slave or slaves of like value, or a sum of money equal to the value of the slave or slaves so dying, to be taken from the residuum of my estate, and I desire and direct that during the minority of my said son, John Hampden Brooks, all and singular the property and estate hereby devised to him shall be and remain in the custody and possession of his mother, and that in respect to the income and profits thereof during his minority she shall therefrom defray and discharge all the charges and expenses of his maintenance

and education, but beyond that shall not be in any wise accountable or chargeable therefor.

10. The portion and share of the estate of my lamented mother-in-law, Mrs. Mary Carroll, deceased, which in and by her last will and testament is devised to my beloved wife for the term of her natural life, with remainder to her children; I do hereby, give, devise and bequeath to my beloved wife, Mary P. Brooks, to be had and held by her not merely for and during her natural life, but absolutely and in fee forever, with power to dispose of it by deed or will, and to do all other acts respecting the same as fully and perfectly to all intents and purposes as though she were the unqualified and unrestricted owner thereof; and for the purpose of making this disposition valid and effectual, I hereby provide and declare that all and singular the devises and bequests in favor of my children and each of them, in this will contained, are and shall be held and taken to be upon the express condition that they and each of them shall assign, release and relinquish to my beloved wife absolutely and unreservedly all and singular their and each of their said rights, interest and estate in remainder accruing to, or vested in them in and by the will of their said grandmother, Mrs. Mary Carroll, deceased, as aforesaid.

11. All and singular the rest and residue of my estate, both real and personal, of every description, I give, devise and bequeath to my beloved wife, Mary P. Brooks, for and during the term of her natural life; and after her death it is my will and desire that the same shall be sold and the proceeds thereof equally divided among my children in fee, share and share alike.

12. I request of my beloved wife that she will annually make certain gifts and presents to the negro slaves bequeathed to her for life, according to a memorandum that I deliver to her.

13. I authorize and empower my beloved wife, out of the estate hereby devised to her for life, to make such advancements as she may choose to any one of our children, always provided, however, that within six months after any such advancement or advancements shall have been made to any one of them, she shall make advancements of like value to the others of our

children ; and provided further, that this restriction shall not be construed to extend to small gifts or presents not exceeding $20 in value.

14. It is my will and desire that my beloved son, John Hampden Brooks, shall at the death of his mother be entitled to take as parcel of his portion of the residuum of my estate, and at the valuation to be placed upon it by five disinterested persons to be appointed by the executors of my will, all that portion of my lands comprehended within the following boundaries, that is to say, a straight line running from the oak corner on the Mims tract to the grape-vine corner next to G. W. Holloway's land, the dividing line, between my land and the lands of Z. W. Carwile, A. P. King, Dr. John Mobley and James Dorn, the Matthews road, and the dividing line between my lands and the lands of Wiley Kemp, Thomas Payne and James Mims.

15. All the residue of my lands lying between the parcel of land carved out for my son, John Hampden Brooks, as provided for in the preceding clause, and the tract of land I have already given to my beloved daughter, Ellen Dunovant, I desire and direct shall be taken at the death of my beloved wife by my said daughter as parcel of her share of the residuum of my estate, and at a valuation to be fixed upon by five commissioners, disinterested persons, to be appointed for that purpose by my executors, if my said daughter chooses.

16. I nominate constitute and appoint my beloved wife sole executrix of this my will for and during the term of her natural life, and after death I confide the execution of the same to my three sons, Preston S. Brooks, James C. Brooks and John Hampden Brooks, as the executors thereof; and I do hereby invest my said executrix and executors with full power and authority to sell and to do all other acts necessary to the execution of this my last will and testament.

Whitfield Brooks left a large estate, consisting of plantation, negroes, horses, mules, cattle, &c., besides silverware, furniture, &c. His widow, Mary P. Brooks, and four children, survived him, viz., Preston S., James C. and John H. Brooks, and Ellen Dunovant. Mary P. Brooks qualified as executrix, and took possession of the estate. Shortly thereafter she paid the claim of

Cornelia Cross, as stated in Judge Pressley's decree. She sold two slaves belonging to the life estate. Other sales and purchases by her, and improvements added, are stated in the Circuit decree.

In 1860 judgments were obtained against James C. Brooks, upon which writs of *capias ad satisfaciendum* were issued, and in 1861 he was arrested, and having applied for the benefit of the insolvent debtor's act, and made an assignment of his entire estate, was discharged from custody. His schedule contained *inter alia* the following: " Whatever interest I may have, in remainder or otherwise, in my father, the late Whitfield Brooks' will, after the death of my mother, Mary P. Brooks." William P. Butler, the assignee, declined to accept the appointment, and never acted as assignee, and no one else was ever substituted in his stead.

In October, 1871, James C. Brooks assigned to J. H. Brooks so much of his interest in his father's estate as would amount to $1500, and to John E. Bacon so much of the same as would amount to $500. In 1872 he assigned to J. H. Brooks, as executor of Mary P. Brooks, all of his interest in his father's estate.

Before that time, in December, 1870, Mrs. Mary P. Brooks died. Her son, Preston S. Brooks, and her daughter, Ellen Dunovant, had survived their father, but predeceased their mother—the former leaving a wife and four children, the latter a husband (R. G. M. Dunovant) and four children. Mary P. Brooks left a will, and appointed J. H. Brooks sole executor, who qualified as such, and also then became executor of his father's will. She gave a plantation of nine hundred and fifty acres, called Turkey Creek, to her son, J. C. Brooks, in trust, after paying for his own maintenance, for his children. Her remaining estate, after a few specific legacies, she divided among her son, J. H. Brooks, and the children of her deceased son and daughter—to each one-third. Clause 12 reads as follows:

" If the debt due me by the said R. G. M. Dunovant for the purchase of my said house and lot in the village of Edgefield, of which he is now in possession, shall not be paid by him within one year next after my death, then, and in that event, the con-

tract to him for the sale of the last-mentioned premises shall be on my part renounced and forever abandoned; and the said house and lot, to be valued at the sum of $5000, shall belong to and vest in my said daughter and her children as parcel of her and their share of my said residuary estate; if such share shall be worth more than $5000, and if such share shall be of less value than that sum, then the said house and lot shall stand charged in favor of the other shares, with so much money as shall suffice to produce equality in value among all the residuary shares."

Mrs. Brooks, before her death, held a certificate of deposit for $2000 in a bank in Columbia. It was claimed by J. H. Brooks, after her death, as his property, by gift from his mother, and he received the money. The only testimony upon this point (his own being objected to) was that of his wife. She testified as follows:

"Witness is the daughter-in-law of Mrs. Mary P. Brooks; resided in the house with her from the time of witness' marriage until Mrs. Brooks' death—about three years; Mrs. Mary P. Brooks spoke to witness more than once about the indebtedness of Chancellor Carroll to Mrs. Brooks, and said that she intended to give it to J. H. Brooks; that she had written to Messrs. Pope & Haskell about it, and that she intended to arrange the matter when she went to Columbia, which she expected to do soon; witness does not remember that Mrs. Mary P. Brooks ever mentioned the amount of the indebtedness; it was some thousands; during her last illness Mrs. Mary P. Brooks asked for the certificate of deposit of the amount due by Chancellor Carroll, when it was brought to her, and she gave it to J. H. Brooks; witness does not remember exactly what she said, but it was something equivalent to 'now it is done;' Mrs. Mary P. Brooks always made the impression on witness' mind that she intended to give this particular money to J. H. Brooks, saying 'that she felt he would need all she could give him, as he had lived so long with her without a home of his own.'

"+ Witness does not remember seeing Mrs. Mary P. Brooks take the paper in her hand and deliver it to J. H. Brooks; saw J. H. Brooks take the paper.

" + + Upon reflection, saw Mrs. Preston Brooks bring the paper and give it to Mrs. Mary P. Brooks, who gave it to J. H. Brooks."

Shortly after Mrs. Brooks' death, J. H. Brooks had the lands of Whitfield Brooks' estate appraised, and also procured an appraisement of the rent for the year 1871. He continued in possession for several years afterwards. There was a great deal of testimony upon the question of rents. A number of witnesses testified as to the sum for which, in their judgment, it would have rented at public outcry. It was also shown what were the products of the place during these years, and what rents were received by J. H. Brooks from his tenants.

After the death of M. P. Brooks, the executor made payments to J. C. Brooks, on account of his interest in his father's estate out of the proceeds of the life estate which had fallen in, and without notice of the general assignment made in 1871. Among the assets of Whitfield Brooks' estate was a note on A. P. Blocker, which was never collected by the life-tenant or her executor, and never could have been enforced by legal proceedings.

At the time of W. Brooks' death he was indebted for the purchase money of certain slaves. His widow paid the debt out of moneys received from her mother's estate. She did not return these slaves upon the inventory of her testator's estate filed by her in the proper office. Her executor claimed the amount so paid as a credit upon her accounts as executrix, which was refused by the referee.

S. B. Griffin, Esq., being referee, made his report, submitting the testimony taken and his conclusions of fact, with a statement of accounts. Exceptions taken thereto by plaintiffs and defendants were heard by his Honor Judge Carpenter, who filed his decree in December, 1875. He directed all the lands of W. Brooks to be sold, sustained the gift of the certificate of deposit, subject to the rights of M. P. Brooks' creditors, approved the charge of the rent for 1871 at the amount fixed by the appraisers, and allowed the counsel fees paid by the executor to be credited on his accounts, but directed that no more should be allowed. Upon all other matters the decision was reserved, and the report was recommitted.

Exceptions to the second report of referee Griffin were heard by his Honor Judge Townsend in October, 1877. In February, 1878, Judge Townsend resigned his seat upon the bench before rendering his decree. By order he was afterwards appointed referee in the causes, and, as such, submitted his report, accompanied by a statement of accounts, in which he allowed credit to the executor for counsel fees paid after the date of Judge Carpenter's order.

On exceptions to the report of Townsend, referee, his Honor Judge Pressley heard the causes at October Term, 1878, and January 2d, 1879, filed the following

### DECREE.

The facts of this case bearing on the legal issues discussed by the referees are fully stated in their reports, and from the mass of testimony attached thereto, I gather other facts which bear on some legal points in which I differ from the referees.

Judge Carpenter has decided the point that the $2000 given to J. H. Brooks, by his mother, was a valid gift. All other points in the case are yet undecided.

The plan of the referees for estimating the rent to be paid by J. H. Brooks, for Roselands, is doubtless the best under the circumstances, but I add $100 a year to their estimate for the last four years. This is done, not as overruling their finding on the facts, but only as enforcing that policy which, in the case of doubt, charges the highest rate to an executor who uses his testator's land without having tested its rental value at public auction.

The referees rightly award to the creditors of J. C. Brooks his share of his father's estate. They take his portion of the land, furniture and silver-plate, according to the priority of their judgments. The other assets which had no corporeal existence in 1861, when he took the benefit of the insolvent debtor's act, must be divided *pro rata* amongst his other creditors of that estate. His said share has not been forfeited for want of the release to his mother which his father's will required; her payments and advances to him under the said will conclusively prove that he did deliver the said release. I do not agree with

the referees that J. H. Brooks, executor, is responsible to the creditors of J. C. Brooks for so much of his share as was paid to him in 1871 and 1872, before they filed their complaint. He cannot be presumed to have had notice of the said assignment made so long ago.

In the matter of the accounts of J. H. Brooks, executor, I find in all the reports of Mr. Griffin a very serious error, which Townsend, referee, also adopts. They charge the said executor with the whole indebtedness of his mother to his father's estate, whereas he should have been charged with only the cash balance of his mother's estate in his hands. Also, there is too much interest charged against him; he could neither have lent out the money on interest nor have paid it to the devisees whilst so many questions of doubt remained to be settled. Under such circumstances reasonable time for proper action is always allowed, and in that case an executor is not usually charged with interest until the end of the twelve months after his qualification.

As to the indebtedness of Mrs. Brooks as life-tenant and executrix under the will of Whitfield Brooks, I differ from both of the referees. They both charge her with the whole inventory, and crediting her with certain payments and advances, and with the value of the emancipated slaves, hold her responsible for the rest of the said inventory. This balance is further reduced by referee Townsend, who allows her the value of such articles as were consumable in the use. To this allowance exception has been filed.

The class of decided cases which charge the inventory of the personalty to the life-tenant are not applicable to this case. They all rest upon the presumed intention of the testator that the life-tenant should sell such articles, invest the proceeds, and use only the income, thus leaving the principal intact to the remaindermen. But no such intention can be presumed in this case; the testator expressly directs that his estate shall be sold *after the death* of the life-tenant. The said estate, therefore, falls under the case of *Calhoun* v. *Fergeson*, 3 *Rich. Eq.* 160, which holds that where a plantation, with the slaves, provisions and other articles thereon, is bequeathed in mass to a life-tenant, he or she is trustee for the remaindermen, and is bound by proper care

and diligence to keep up the whole estate to its original value. But, if such care and diligence be used, and nevertheless a deficiency in the value of such estate should arise from causes beyond the control of the life-tenant, then he or she is not responsible for such deficiency. Under this rule the referees do not charge the value of the emancipated slaves, and, by the same rule, they should not have charged any depreciation in the value of the vehicles, implements of agriculture, or of the work animals, which, as one of the results of the late war, fell upon this estate no heavier than upon others the best managed in this state.

I can see no reason why a life-tenant should be held chargeable for losses which other persons, the most prudent and the most careful, had to suffer, and could not prevent in their own estates. Holding that this life-tenant is not so chargeable, unless for default of care and lack of proper prudence, I have carefully examined the mass of testimony attached to the referees' reports, and find therein no shadow of proof that Mrs. Brooks was ever wanting in faithfulness to her trust. There is no evidence, and not the slightest probability, that she applied to her own use any of the money on hand at the death of Whitfield Brooks, or any of the proceeds of the notes, accounts or cotton which he left. The whole of these was about $5700. He must have owed some debts, such as physician's bill, overseer's wages, and other items incident to a large family and several plantations with numerous slaves. Besides these were the usual expenses of administration, including the usual and necessary counsel fees. As the executrix kept no account, it would scarcely be possible to prove payments of this character after the lapse of more than twenty years, and after the death of the said executrix. But if, notwithstanding the almost positive certainty that she did make payments of considerable amounts in that behalf, credit for the same be denied for her want of proof, yet even the items now proved to have been paid by her, including her lawful commissions, exceed the money which she received by more than $1500. In making this estimate I include her commissions, not only on the said $5700, but also on the proceeds of a large amount of real and personal property, which, soon after the death of Whitfield Brooks, she sold and divided as his will directed. Town-

send, referee, supposed that she did not account for that property in her lifetime, but at the hearing of this case it was admitted by all the parties that immediately after the sale the proceeds were fully divided.

Following these commissions is a payment by her of $1690, the legacy to H. Brooks; also, an advance of $1000 to J. C. Brooks to equalize his share with others who have received slaves to that amount. Then follows a payment of $3662 to Cornelia Cross. Concerning this item, it appears in the testimony that Whitfield Brooks, only six months before his death, filed his last account as executor of his father. It showed that he was then indebted to that estate in the sum of $6167.52, to wit, $2871.26 to the share of William Gillison and wife, and $3296.26 to the share of Charles Cross and wife, both the said items bearing interest from November 21st, 1849. There is no proof as to the time when the share of Gillison and wife was paid, or by whom it was paid, but the proof is very clear that Mrs. Brooks paid the share of Cornelia Cross, which, with the interest and counsel fee, amounted to $3662.

But the referees raise the legal presumption that the payment to Cornelia Cross was made out of assets which Whitfield Brooks in his lifetime had reserved for that purpose from his father's estate. I fail to find in the testimony any proof whatever of the existence of such reserved fund, and the idea of its existence is completely rebutted by the fact that the decree of the court, under which said payment was made, did not order the transfer of any reserved fund or the collection of any assets of which Cornelia Cross was to have the proceeds; on the contrary, its direction was that Mrs. Brooks pay the amount, principal and interest, and that direction is consistent only with the supposition that Whitfield Brooks, as executor, owed that amount to his father's estate, having previously mingled its assets with his own. It is, therefore, very manifest that this payment was or should have been from the assets of the estate of Whitfield Brooks, and that, adding it to the other payments of his executrix and to her lawful commissions, it makes the amount of her payments for his estate greatly exceed what she received in money, even omitting the very considerable payments that she must have paid, but which

have not been proved, and thus a large portion of the income of her life estate was dedicated to the benefit of the remaindermen.

After this she further freely used her income to build on the plantation five cabins for the slaves, a large wheat barn, an additional stable for the work animals, and a large shed for the other stock. She also purchased brood mares to keep up the supply of horses, and introduced improved breeds of cattle and hogs; she sold five of the old mules, and replaced them with five young and more valuable; and she kept such constant care of the slaves that they had increased, at the time of their emancipation, forty more than when she received them. Thus by her constant care and diligence the whole estate was improved, until further improvement was rendered impossible by the late war. That left this estate as it did all others within its sweep. Her means to restore its losses perished with confederate money. She reserved from year to year unsold portions of her cotton crop, and after the war her own money, the proceeds of this cotton, was very largely expended by her in restoring the plantation, organizing labor, replacing the work animals and other stock upon the same. At the time of her death the cattle, hogs and sheep on the said plantation were appraised at more than those left thereon at the time of the death of her testator, but the mules, horses, plantation vehicles and other implements, were deficient. So, also, was the provision crop made during the last year of her life. For these deficiencies I hold that she is not chargeable. So far from having been a faithless trustee to the remaindermen, she did more after the war to restore and keep up the value of the estate in her hands than it was reasonable to expect of her, and very few planters in this state did so much for their own estates as she did for this.

I therefore adjudge and decree that her estate be charged only with the sum of $816, the value fixed by the referee on the furniture and silver plate which she bequeathed to J. H. Brooks; also, that the proceeds of the work animals, cattle, hogs, plantation vehicles and tools left on hand at her death be carried to the credit of her testator's estate. That being done, I hold her estate no further liable.

The provisions of the will of Mrs. Brooks do not require

special detail; after some small legacies, it directs an equal division of the rest of her property among her children. Her house and lot in Edgefield has been surrendered by Gen. Dunovant, who held it under a contract to purchase; his children now have possession of said house, and at a price named in the said will they are to keep it as a part of their share. Its rental value for the time they held it, to be fixed by appraisement or otherwise, must be added to that price.

J. C. Brooks, for his children, is in possession of the Turkey Creek plantation, bequeathed to them; it also must be appraised, and its rental value fixed in order to equalize all the shares, as the said will directs.

Let J. H. Brooks restate and file his accounts as executor of each of the said estates, in accordance with this decree.

The parties to this cause, all or any of them, may apply to me or to the judge of the Fifth Circuit, at chambers, for such other and further orders as may be necessary to execute this judgment and decree, and to settle the said estate in accordance therewith.

From this decree appeals were taken by plaintiffs and defendants in both causes, upon the several grounds stated—

By J. H. Brooks, as executor of W. and M. P. Brooks, and J. C. Brooks.

1. His Honor erred in adding $100 to the estimate of the referees, report upon the rents of Roselands, for the last four years, such decision being contrary to law and evidence in interfering with the findings of facts by the referee, and also arbitrary and without foundation.

2. His Honor erred in deciding that J. C. Brooks has executed the release required by the tenth clause of Mr. Whitfield Brooks' will, there being no evidence of such execution, and the same being denied in the answers of the said J. C. Brooks and J. H. Brooks, executor.

3. That his Honor erred in deciding that J. C. Brooks' creditors can take at all in the present state of the pleadings, that portion of his land, furniture and silver plate, under his father's will, and that the same is distributable among his creditors according to the priority of their judgments—inasmuch as the said

J. C. Brooks takes no such property, and that all such interest as he does take under said will of whatever description, is but equitable assets in the hands of the executor, to be distributed *pro rata* among all of his creditors.

4. His Honor should have dismissed the amended complaint of M. C. Butler, as assignee; J. C. Lark, survivor, *et al., v.* J. H. Brooks, executor, and J. C. Brooks, upon the grounds stated in the answer thereto, and in the ninth exception of the defendants J. H. and J. C. Brooks.

5. That his Honor erred in decreeing that the children of Gen. Dunovant should take the house and lot in Edgefield at $5000, "as a part of their share" under Mrs. Brooks' will, without decreeing further, as said will directs, that should that sum ($5000) be more than they were entitled to under said will, the said house and lot should stand pledged for the payment to the other legatees of such a sum as would equalize all the parties interested.

6. His Honor should have decided the point made by the answer of J. H. Brooks, executor, and J. C. Brooks, and insisted upon in argument; that the assignment by J. C. Brooks to John E. Bacon and J. H. Brooks, of so much of his interest in his father's estate as would amount to $1500 and $500 were valid, and should prevail as against the assignment under the insolvent debtor's act, by said J. C. Brooks to his creditors. The facts being, that the said J. H. Brooks had no notice of the latter assignment made over ten years before the former, and never acted upon in any way by the assignee or the creditors; that property enough was assigned under the insolvent debtor's act to pay the debts of the said creditors, and that they took no steps for a period of over ten years to enforce the collection thereof; and that the said J. H. Brooks accepted the said assignments to the said Bacon and himself in good faith, and is bound to pay the same, and upon the grounds set forth in the pleadings and exceptions.

7. That Judge Carpenter, in his decretal order of December 13th, 1875, should not have overruled the executor's second exception, but should have decided that the life-tenant should not

be held accountable in any way to the testator's estate in remainder.

8. That Judge Carpenter errs in the sixteenth paragraph of said decretal order, in deciding, that although the gift of the $2000 certificate by Mrs. Brooks to J. H. Brooks was valid, still that he should account therefor in case of the insolvency of her estate.

9. That Judge Carpenter, in the seventeenth clause of the said decretal order, errs in deciding that J. C. Brooks and his children hold the Turkey Creek place subject to the creditors of Mrs. Brooks, and should have decided that they hold it absolutely and in fee.

10. That his Honor should have decided the issues made by the executor in the first and fourteenth exceptions to the report of C. P. Townsend, referee.

By R. G. M. Dunovant and his children, and James C. Lark, survivor, a creditor of J. C. Brooks—

1. Because his Honor erred in not holding that the estate of the life-tenant should be charged with the entire inventory of 1852, including provisions and articles consumable in the use, with the exception of the slaves not sold by her.

2. Because in stating the accounts in reference to the liability of the life-tenant no credit should be allowed the life-tenant for abrasion and use of the furniture, plate, &c., the difference in value resulting from abrasion and use not having been determined by a sale of said furniture, plate, &c., at the death of the life-tenant nor by any lawful appraisement, and his Honor should have so held.

3. Because in stating the account in reference to the liability of the life-tenant, the estate of the life-tenant should have been charged with the value of the two slaves sold by said life-tenant, and his Honor should have so held.

4. Because the estate of the life-tenant should have been charged with the Blocker note, and his Honor should have so held.

5. Because the executor, J. H. Brooks, should have been charged with the rents actually received by him for the years

1871 to 1877 inclusive, and said rents should not have been determined upon by the speculative testimony and opinion of witnesses; and their Honors Judges Carpenter and Pressley, erred in holding that said executor was not chargeable with the rents actually received by him.

6. Because the executor should not be allowed any commissions for the years in which he made no returns, and his Honor Judge Pressley should have so held.

7. Because in the statement of the accounts of the executor by Referee Townsend, he should not have been allowed credit for $1363.24 paid out in 1871 and 1872, when the payments for said years actually amounted to only $331.71, if so much as that, and it was admitted at the hearing before his Honor Judge Pressley, that the same was a clerical error, and his Honor should have held that said clerical error should be corrected.

8. Because the crops made by the life-tenant in the year 1870 on the lands held by her as life-tenant constituted a part of her testator's estate, and his Honor should have so held.

9. Because no counsel fees should have been paid by the executor without leave of the court, after the order of Judge Carpenter refusing to allow further counsel fees, and his Honor Judge Pressley should have so held.

10. Because his Honor Judge Carpenter erred in holding that the certificate of deposit of $2000 was a gift to J. H. Brooks by his mother, Mrs. Mary P. Brooks.

11. Because his Honor Judge Pressley erred in holding that the life-tenant was entitled to credit for the amount paid to Mrs. Cornelia Cross under an order of the court, the proof being that it was not paid out of the life-estate, and there being no proof that it was paid out of the life-estate.

12. Because his Honor Judge Pressley erred in holding that the life-tenant was entitled to credit for the negro cabins and other improvements erected by her on the life-estate during her life-tenancy.

13. Because his Honor Judge Pressley erred in holding that the life-tenant was entitled to commissions, and more especially that she was entitled to commissions on property sold by her, and of which she made no returns.

14. Because his Honor erred in holding that the children of R. G. M. Dunovant are chargeable with the homestead lot in Edgefield village at $5000 and the rent, the proof being that said property was sold by the executor, who is chargeable with the proceeds thereof and with interest upon the same, and in any event said children are not chargeable with the same.

15. Because his Honor Judge Pressley erred in holding that the Turkey Creek place is vested in James C. Brooks and children, it having been decided by Judge Carpenter that they hold it under the will of Mrs. Brooks and subject to her debts.

16. Because his Honor Judge Pressley erred in holding that the estate of the life-tenant is only chargeable with $816 as the value of the furniture, plate, &c., received by her when she took charge of the life-estate, after giving her credit for the decrease in value from use and abrasion.

17. Because his Honor erred in holding that the executor, J. H. Brooks, is not chargeable with interest on the funds received by him as executor until after the expiration of one year.

18. Because if the rule adopted by his Honor is the correct one for ascertaining the rent, then for the reasons stated by him he should have charged the executor with a larger amount for rent for the years stated by him, and a larger amount should have been charged for the years previous to those stated.

19. Because his Honor erred in holding that the executor should only have been charged with the cash balance of his mother's estate in his hands.

20. Because his Honor erred in holding that the estate of the life-tenant " should not have been charged with any depreciation in the value of the vehicles, implements of agriculture, or of the work animals," she being bound under the law governing the case to keep the estate in all its departments up to the condition it was in when she received it.

By R. G. M. Dunovant—

1. Because, by the decree, his Honor does not hold that the executor, J. H. Brooks, should be charged with the difference between the appraised value of the lands of testator and the price for which they sold, he having held said lands until they were

greatly depreciated in value, and contrary to the provisions of the will.

2. Because J. H. Brooks should have been charged with the difference between the appraised value of the property sold by him January 5th, 1871, and the price for which he purchased it.

By J. C. Lark—

1. Because he holds that the share of J. C. Brooks should be distributed among his creditors according to their legal priority, and not as equitable assets.

2. Because his Honor holds that J. H. Brooks, executor, is not responsible to the creditors of J. C. Brooks for what he paid over to J. C. Brooks before said creditors filed their complaint.

By James Mansfield (creditor of J. C. Brooks.) Because his Honor held—

1. That Judge Carpenter had never decided but one point in the case, to wit, that the gift of $2000 by Mary Brooks to J. H. Brooks was valid.

2. That while recognizing the principle of law that an executor should be held liable to the highest rate of rent who uses his testator's land without having tested its rental value at public auction, he only partially enforced the same, whereas he should have carried out said principle to its full extent, which would make the rent at $1000 per annum.

3. That J. H. Brooks is not responsible to the creditors of James C. Brooks for paying him, in 1871 and 1872, certain sums of money out of his father's estate as a part of his share of the same.

4. That the executor, J. H. Brooks, should not be charged with the indebtedness of his mother to his father's estate; that referees should not have charged her with the inventory; "that the class of decided cases which charge the inventory of the personalty to the life-tenant is not applicable to this case."

5. That executrix did not apply to her own use the money on hand at the death of the testator, as also the proceeds of the notes, accounts and cotton on hand, while not accounting for the same, amounting to about $5700, and that the executor did not receive,

retain and appropriate entire commissions on each and all transactions when she was entitled to the same.

6. That the proof is very clear that Mrs. Brooks paid the share of Cornelia Cross out of her own funds; whereas it is more than probable that she paid it out of the funds of testator, and that, with her usual prudence, reserved her commissions, while the pecuniary means and business character of testator totally negatives the idea that he had commingled said share and his own property, or did not leave a distinct and designated fund to settle it.

7. That the crop of 1870 did not go to testator's estate.

8. That life-tenant should not account for the two slaves sold by her.

9. That life-tenant should have credit for erecting negro cabins, barns, &c.

10. That the house and lot in the village, now in possession of R. G. M. Dunovant and his children, and the Turkey Creek plantation now in possession of James C. Brooks' children, are not liable for indebtedness of life-tenant to testator's estate; that the children of each (R. G. M. Dunovant and J. C. Brooks) hold the same.

11. That the executor's estate is only chargeable with $816, on the value of the furniture, plate, &c.

12. That the executor should be allowed credit for $1363.24, as paid out by him in 1871 and 1872, instead of $331.71.

13. That the scrip or certificate of deposit in bank was a valid gift.

14. That both referees, Judge Carpenter and his Honor, erred in not holding the life-tenant, Mrs. Mary P. Brooks, and J. H. Brooks, her executor, to that strict accountability as trustees which the *law* requires; while recognizing the doctrine, neither has fully enforced the same.

*Messrs. J. E. Bacon, M. L. Bonham* and *L. E. Le Conte,* for J. H. Brooks and J. C. Brooks.

*Mr. H. W. Addison,* for James Mansfield.

*Messrs. A. J. Norris* and *J. C. Sheppard*, for R. G. M. Dunovant and his children, and J. C. Lark.

October 3d, 1879.   The opinion of the court was delivered by

WILLARD, C. J.   A question of construction upon the will of Whitfield Brooks is fundamental to the present accounting.

After making various specific devises and bequests and pecuniary legacies, the testator, in the eleventh clause of his will, provides as follows: "All and singular the rest and residue of my estate, both real and personal, of every description, I give, devise and bequeath to my beloved wife, Mary P. Brooks, for and during the term of her natural life; and after her death it is my will and desire that the same shall be sold and the proceeds thereof equally divided among my children in fee, share and share alike." The question arising in the first instance on this clause is whether Mary P. Brooks was to take a life-estate, to be specifically enjoyed by her as such, or was she simply to enjoy the interest of a fund equivalent to the value, at the death of the testator, of the estate that passed to her under the residuary clause—the principal of such fund to pass to the children of the testator at her death?

It is clear that Mary P. was not intended to take independently, as specific devisee and legatee, each of the items of which the mass of the estate was composed, for, in the first place, the form of the devise precludes such construction, it being in its character residuary, implying primarily that that which passed was to be taken as a whole; and, in the second place, part of the residue of the estate consisted of personal property in its nature consumable in the use and not reproductive, in which a life-estate with remainder could not be created by way of an independent specific bequest, so that the only mode in which the residuary devise could operate, with full effect as to all that was intended to be included in it, was by treating the residue of the estate as intended either to be specifically enjoyed in mass or as a fund producing interest according to its value.   *Calhoun* v. *Fergeson,* 3 *Rich. Eq.* 160; *Devlin* v. *Patterson, McM. Eq.* 459.

Was the estate, then, intended to be enjoyed specifically in mass, or as an interest-bearing fund, its value to be computed at

the death of the testator? The fact that it was devised as a remainder standing by itself would lead to the conclusion that the testator intended that the whole residue should, at his death, be converted into money and enjoyed, after payment of debts, according to the terms of limitation, as a fund. But this inference, in the case of a devise of a *residuum* to a tenant for life with remainders, is rebutted by the expression of an intention that the sale shall be postponed until after the death of 'the life-tenant. The reason of this conclusion is that the motive of postponing the sale must be assumed to be a desire that the tenant should have the specific enjoyment of the property itself. *Calhoun* v. *Fergeson,* 3 *Rich. Eq.* 160; *Glover* v. *Hearst,* 10 *Rich. Eq.* 329.

In the present case, the sale of what passed to Mary P. under the residuary clause was postponed until after the death of the life-tenant. That the provision for the sale of the residue after the death of Mary P. was intended as a postponement of such sale, and not merely as a provision for the final disposition of what had not previously been sold, is apparent from other clauses of the will. As it regards the realty part of such residue, the sale could not take place at an earlier day than that of the death of the life-tenant, because, as to certain parcels of such real estate, J. H. Brooks and Ellen Dunovant were to have at that time an election to take such parcels specifically at a valuation to be ascertained, and accordingly a sale could not take place until such election was made or declined. As it regards the slaves, two distinct clauses of the will contemplate their remaining specifically in the hands of the life-tenant during the whole or a considerable part of her life. Clause 9 provides for the substitution, out of the slaves of the estate, in the case of the death during his minority, of certain slaves bequeathed to John H., and thus contemplates the permanence of the source from which such substitution was to be made for a considerable period after his death. Clause 12 contains a request that the life-tenant should make annual presents to the slaves bequeathed to her for life, thus contemplating their indefinite continuance specifically in her service.

It is beyond doubt that the sale intended was to embrace both

realty and personalty together, so far as their union was essential to maintain the value of the estate as a whole, and therefore the provisions that tended to postpone the sale as to part of the property in the residuary clause must be regarded as fixing a construction on the eleventh clause as it regards the sale.

Having concluded that the life-tenant, at the death of the testator, took, under his will, a life-estate in the residue of his estate, to be enjoyed specifically, it is necessary to state the principles that should govern an accounting by her executor, after the termination of such life-estate.

It is necessary here to recognize the fact that John H. Brooks, as the executor of Mary P., is properly called upon to account, in addition to his own doings, for those of his testatrix, in her individual right, and as executrix of Whitfield Brooks.    In order to state such an account accurately, it is necessary to know what part of the estate of Mary P. that came into the hands of her executor was assets of her individual estate, and what part, if any, assets of the estate of Whitfield Brooks.

As to each of these distinct parts, separate rules of accounting are to be applied.    It is necessary to consider, then, in the first place, the rules governing an accounting by the executor of a tenant for life of an estate held for specific enjoyment in mass.

In the first place, the time to which the accounting relates is the death of the life-tenant, and not that of the testator.    In this respect, an accounting by a life-tenant differs from that of an executor.    The life-tenant is entitled to hold the whole estate for his own profit, subject to certain conditions or obligations.    His primary duty is to maintain the estate in as good condition as when it came into his hands.    If this estate is one of a productive character, as in the present case—being a plantation—that productive character must be maintained.    It is self-evident that the utmost duty of the life-tenant, in this respect, is to apply the product or increase of the estate to its maintenance, so as to be in a productive condition when it passes into the hands of the remainderman.    So far there is no conflict among the authorities. The question affecting the liability of the estate of the life-tenant at his death is, whether the estate, at that time, was, as a whole, in a proper condition as to value and productive capacity.    As

it regards value apart from productive capacity, the test is not a comparison between its pecuniary value at the death of the testator and at that of the life-tenant. The value of property of that class may have undergone change, and the non-productive property of the estate may have undergone deterioration from natural causes, or from accident, without the fault of the life-tenant, in which case it appears that the estate of the life-tenant is not accountable for such loss or deterioration. These principles are clearly recognized and illustrated in *Calhoun* v. *Fergeson*, 3 *Rich. Eq.* 160. The question is not whether each article of a class of articles that went to make up the estate as a whole is in the same condition as to preservation, value and productiveness as at the death of the testator, but whether the estate, as a whole, is in a similar condition. In making such an inquiry the condition and value of the parts of the estate must necessarily be considered, for the value of an estate is the sum of the value of its parts considered in their relation to the whole.

Johnston, Chancellor, says in *Calhoun* v. *Fergeson:* " I think the inquiry should be made into the particulars of the estate and their value at the time the remainder takes effect, for the purpose of discovering whether that which is to go over is substantially the same estate which was received by the life-tenant, and of the proper value, and whether, upon the whole, it is in as good plight, though not in the exact plight as when the life-tenant took possession." He holds that the increase of one species of stock should be balanced against the diminution of another, and says that if, upon the whole, the life-tenant " has been faithful and diligent and judicious, and has not deteriorated the substantial parts of the estate as a whole, he should not be made to suffer."

It is easy to perceive that under this view lies the consideration that the business conducted with a view to profit should be capable of modification to suit the various conditions that may arise affecting the question of profit. A large planting or farming estate usually embraces several distinct sources of profit, not necessarily connected together and not equally profitable at all times and under all circumstances. Its produce may cover a wide range of animal and vegetable products, and embraces that

intended for home use and consumption, as well as that intended for sale or barter. Adaptation to the ever-changing wants of mankind is the condition of profit, imposing changes of internal economy.

In addition to this the means and methods of production undergo changes. Such causes operate to occasion changes in the relative adjustment of permanent property, stock and implements. It is evident, then, that what concerns the interest of the remainderman is that the tenant for life of such an estate should exercise a reasonable judgment in maintaining the general capacity of the estate for production, without improperly lessening the value of that which constitutes the capital invested with a view to such profit. The rule laid down in *Calhoun* v. *Fergeson* fairly conforms to this view. The strength of these conclusions will appear in *Glover* v. *Hearst*, 10 *Rich. Eq.* 329. In that case, although the life-tenant was limited to taking a mere support from the profit of an estate devised in mass, and as to all profits over and above what was needed for her support was a trustee for the remainderman, yet the general rules, as to the duty of the tenant for life to maintain the estate, were laid down in substantial accordance with the doctrines of *Calhoun* v. *Fergeson*. In *Finley* v. *Hunter*, 3 *Strob. Eq.* 78, the estate was not regarded as devised in mass, but the life-tenant was regarded as holding the several classes of property devised, by distinct specific devises, so that the question of the value and profitableness of the estate, as a whole, was not involved; still, the same general rule as that already stated, was applied, as it regarded such class separately devised.

The devise in *Devlin* v. *Patterson*, *McM. Eq.* 459, does not appear to have been regarded as a single devise of an estate in mass, although the nature of such devises is recognized in the opinion of Nott, J.; consequently we should not look to the discussion in that case for the rule applicable to devises of productive estates in mass, nor can that case be regarded as touching directly this subject.

The duty of the life-tenant, as it regards the application of the consumable products of the estate to its maintenance as a whole, and of the several parts of which it consists, has been the

subject of much discussion and apparent contrariety of opinion. The question has generally been stated in our own reports as that of the duty of the life-tenant in applying the consumable property of the estate to its maintenance, but probably the word *merchantable* or *vendable* would best describe the class of property entering into that question, as those terms would embrace such property, the product of the estate over and above what were needed for the current support of the estate as was disposable by sale or barter, and thus was available as a means of supplying deficiencies in the permanent property, stock and implements considered as the capital of the estate.

There are two aspects of this question, first, as with regard to the produce of the estate in hand at the death of the testator and that passed as part of the gift to life-tenant; and, second, as it regards the produce of the estate while held by the tenant for life. The last of these questions will be first considered, as furnishing the simplest illustration of the principles that enter into the solution of the other.

The question of the duty of the life-tenant, as it regards the produce of the estate made in his hands, is necessarily connected with that of the proper disposition of such of the produce of the estate, arising while in the hands of the life-tenant, as may remain in specie at his death.

If the product of the estate in the hands of the life-tenant is reasonably sufficient for the maintenance of the life-tenant, it is clear that any surplus over this amount should go to keep up the value and productiveness of the estate to the condition in which it came into the hands of such life-tenant. There can be no doubt as to this proposition upon the authorities. The question becomes now completed when there is an inadequate production for the reasonable maintenance of both the life-tenant and the estate.

When one devises an estate for life to one with remainder to another, each must be regarded as equally the object of his bounty. Not that they will necessarily have equal enjoyment of such bounty, for their gifts necessarily differ as to time and quantity, but the object sought by the testator to be attained by the respective gifts should be regarded as standing in equal im-

portance before his mind. The one object is near to him in point of time and represents his present wishes, while the other, though more remote, is presumably more permanent. It is not difficult to conceive such gifts as connected by equality of importance in the mind of the testator, nor to see the relation of such an idea to the habitual ideas of equity. We have, then, two objects to be accomplished by the application of the produce of the estate—one intended to benefit the life-tenant and the other the remainderman. The one looks to it for present maintenance and the other as a capital capable of future productiveness for his benefit.

It is clear that it would be a violation of the principles of equality to hold that whatever fortuitous event diminishes the productiveness of the estate, such mischance should be thrown wholly upon the tenant for life by requiring him to make good any amount taken for his necessary support, in order to maintain the value and productiveness of the estate to the full measure it had when it came into his hands. Such a construction could only be based on the idea that the testator intended a bounty for the remainderman, not only differing as to time and quantity, but in its nature, considered as an act of bounty. This, as we have seen, is an inadmissible conclusion; but its evil tendency is fully illustrated when it is considered that the labor and skill of the tenant for life has entered into that produce, and to that extent it would be seizing the property of one to confer it upon another.

It is equally clear, on the other hand, that the tenant for life should not be permitted to appropriate to his own purposes the whole product of the estate, making no provision for the future maintenance of the estate, for this would violate the plainest rules of ordinary prudence as well as equality. It would follow that the produce of the estate ought to be equally applied to the reasonable maintenance of the life-tenant and of the estate itself, and if that prudence should, without the fault of the life-tenant, be inadequate to fully accomplish both objects, the life-tenant and the remainderman should submit to equal inconvenience. The application of such a rule may at times be difficult and involve intricate questions of fact, but the difficulty of applying

2 F

a sound principle ought not to be balanced against the wrong of refusing its application. It remains to consider the bearing of the authorities on this question.

An expression contained in the Circuit decree made by Chancellor Caldwell in *Calhoun* v. *Fergeson*, 3 *Rich. Eq.* 160, is in point. He says: "It would seem that the testator intended that the property should support him" (the life-tenant) "and itself, so that she should not impair it." This inference as to the intent of the testator is drawn from the nature of the estate created in that case, namely, a life-estate to be specifically enjoyed in mass. The question we are now considering did not directly arise in that case, still the remark is significant, and it will be observed that it was not called in question on the appeal. Johnston, Chancellor, after speaking of the general duty of the tenant for life of an estate in mass to keep up the consumable but reproductive property, such as flocks and herds, says: "I will not say that he is bound at all hazards for the original stock, for the relation he bears to the remainderman is that of a trustee, a relation of confidence, and though he is *prima facie* bound for the property, and the burden must be upon him to show diligence and integrity in the performance of his duties, yet it is not clear upon principle that he is liable if he does show fidelity to his trust, and that the flock has perished, not by his fault, but by the act of God, as by pestilence, earthquake or other unavoidable providence." If the Chancellor had recognized the rule, that whatever might be the cause of the diminution of the original stock the tenant must make it good to the extent of the whole product of the estate, without deducting anything for his own maintenance, he certainly would not have discussed the question in the form in which it appears to have been treated by him. The question of making up the loss out of the produce would, it may be presumed, supersede that of responsibility for the original loss, or, at all events, so modify it as to become a necessary part of its discussion. It must be concluded that the idea was not entertained at the time *Calhoun* v. *Fergeson* was decided that the life-tenant was bound to apply the whole produce of the life-estate to make good losses to the capital of the estate occurring without his fault. It is proper to

remark that the argument from the relation of the trustee, between the life-tenant and the remainderman, should not be carried too far. The life-tenant primarily holds the legal title for his own beneficial enjoyment, and in that respect does not sustain the relation to the remainderman that gives rise to a technical trust. But as it regards the preservation of the value and productiveness of the estate, he owes a clear duty to the remainderman which may fairly be said to be in the nature of a trust, and as such cognizable in equity. *Glover* v. *Hearst*, 10 *Rich. Eq.* 329. In order to understand the application of the remarks made by the court in that case, it is necessary to have in mind the peculiarity of the interest of the life-tenant there. What was given to her there was " to enjoy all the benefits and profits arising merely from the use of the same, after fully supporting and supplying all the wants of the plantation during her natural lifetime." The will adds: " And here let it be understood that all future increase will not be regarded as profits, but will remain and be regarded as part of my estate." To carry out this plan the testator gave to his executor a certain supervisory power as it regards the management of the life-tenant. According to this provision the produce of the estate was devoted in the first instance to meeting the wants of the estate itself; second, to supporting the life-tenant; third, to accumulate as part of the estate to go to the remainder. Such a case does not test the principles on which the rights of a life-tenant are to be determined who has the whole usufruct during the life-tenancy, though coupled with the implied duty of maintaining the estate. Wardlaw, Chancellor, says: " The tenant for life must, therefore, be considered as a trustee for the remainderman, and must preserve the estate, with all its appurtenances, in the situation in which she received it." This, as applied to the situation of the life-tenant in that case, is undoubtedly correct, if it be added that such liability to make good the original stock should not go beyond the amount of the product of the estate. It is remarked in that case that the devise there was similar to that in *Calhoun* v. *Fergeson*, but while the two agree in the fact that both estates were devised to be specifically enjoyed in mass, in the one case the tenant of the life-estate had an unrestricted beneficial inter-

est, as in the present case, while in the other such beneficial
interest was not only restricted in quantity, but burdened with
the express duty or trust of maintaining out of the produce of
the estate its original condition.  It was natural that in such a
case the general rule requiring the estate to be maintained should
be considered, without noticing the ordinary limitations of that
rule, as such limitations were inapplicable under the terms of the
devise in that case.  Having in view this fact, we must under-
stand that when it is said, as in that case, that the tenant " must
keep up the stock of cattle, horses and provisions, and imple-
ments of husbandry in the condition in which he received them,"
it is meant that such is his general duty, but not that such duty
is unqualified by any exceptions or restrictions.  What these ex-
ceptions and restrictions are, that case does not attempt to show,
inasmuch as they were not applicable to the peculiar case then
before the court.

 *Finley* v. *Hunter*, 3 *Strob.* 78.   The court withdrew that case
from the rule governing estates in mass in the hands of a tenant
for life, and placed it on particular expressions of the will.   The
duty of the life-tenant to apply the produce of the estate to repair
losses, is not considered.   It is easy to see that that case mani-
fests a tendency quite contrary to that of fixing the duty of
making reparations to the full extent of the product of the estate.
The fact that the rule was found stated in the previous cases,
apart from its qualifications, may have had an influence in the
withdrawal of that case from the rule.   *Robertson* v. *Collier*, 1
*Hill Ch.* 370.   That case cannot be regarded as involving the
rights of a tenant of an estate in mass to be specifically enjoyed.
It was granted by a residuary clause which the court recognized
as primarily implying that the estate was to be sold and enjoyed
as an interest-bearing fund.   In that case there was no clear
intent that the sale of the estate should be postponed until the
end of the life-estate, from which an intent could be gathered
that it should be specifically enjoyed by the life-tenant at her
will, but, on the contrary, power was expressly granted to his
executor and executrix (the life-tenant) to sell during the life-
tenancy, in terms that implied that the interest of the estate was
to be solely consulted as to such sale, and not the interest or

inclination of the life-tenant. This placed the life-tenant, as executrix, in a position of responsibility differing essentially from that of one who enjoys the specific use of the estate for life, according to the will of the devisor.

On the whole it must be concluded that the cases in our reports afford some support to the rule that has been stated above, and contain nothing necessarily impugning its correctness. The rule can, therefore, stand, if its reasonableness has been made apparent.

The next question to be considered is, as to the right and duty of the tenant of an estate specifically enjoyed in mass and productive in its nature, as it regards the produce of the estate realized at the death of the testator and passing under the devise of the life-estate. The true inquiry in this connection is, whether such produce is merchantable or otherwise. The produce of an estate, as a general rule, certainly ought to go, in the first instance, to maintain the estate. There can be no doubt about this proposition, either on principle or on authority. It cannot well be considered as separable from the estate when that separation would tend to impair the value and productiveness of the estate. It is, therefore, reasonable to consider that the produce of the estate on hand at the death of the testator, to the extent that is proper to be consumed or used for the benefit of the estate, should be considered as a part of the estate, and, as such, to be accounted for only as a part of such estate as a whole. On the other hand, a surplus of produce on hand at the death of the testator, over and above what was reasonably needed for use or consumption or for the benefit of the estate, would naturally assume a merchantable character as commodities suitable for sale or barter. If such vendable property is, in its nature, consumable in the use, being no necessary part of the estate as a productive. whole, the only mode in which a life-tenancy with remainder could be enjoyed in it, as held by the cases already cited, is by treating its pecuniary value as an interest-bearing fund.

If such property is not consumable in the use, the tenant for life would stand to it in the same position as if it had been the subject of an independent specific bequest; that is, would have its use for life, exercising reasonable diligence to preserve it for the remainderman who would take it in the condition it was in

at the death of the life-tenant. This result would flow from the mere fact of regarding such property as detached from the estate by a natural process, like that which detaches the ripe fruit from the parent stem.

It would follow from these principles that if the tenant for life takes property of this class at the death of the testator for his own use, that his estate at his death would be liable to account, in a corresponding manner, for a reasonable quantity of like property on hand at that time. It would also follow that when the life-tenant dies before the agricultural year is completed, the produce of such year should be realized to the estate of the life-tenant, subject to such accountability as that just stated.

It remains to consider what support these conclusions have from the authorities.

*Calhoun* v. *Fergeson*, 3 *Rich. Eq.* 160. It was held in that case that although the life-tenant of an estate devised in mass is only accountable for causing or permitting the deterioration of the estate as a whole, still, in making this inquiry, regard must be had to the several kinds of property of which the estate is composed, and the rules applicable to each kind. It would follow that the produce of the estate on hand at the death of the testator may be considered as if the subject of an independent specification, subject, however, to the consideration that if found a necessary part of the estate as a whole, any loss or deterioration may be balanced by corresponding gain in other parts of the estate as a whole. It is clear, then, that a discrimination must be made between that part which cannot be separated from the estate without loss to the latter, and that part which may be regarded as the merchantable product of the estate. The former would be considered under the general question, whether the estate, as a whole, has suffered improper deterioration; the latter part would be considered as the subject of an independent specific devise, and the life-tenant would be answerable for it if of the nature consumable in the use as a fund, according to the value which was or ought to have been realized for it; and if not consumable in the use, then for such property specifically in its condition at the death of the life-tenant and for damages for improper deterioration.

In the case of *Calhoun* v. *Fergeson*, which we are now considering, it would appear that the Circuit decree held the life-tenant "liable to reproduce, at the expiration of her life-estate, the same amount of corn which she received with the estate or account for the value of the deficiency."

This part of the decree was properly reversed. It does not appear in that case that the corn upon the estate at the death of the testator exceeded what was required to supply the current wants of the testator. Chancellor Caldwell holds that it was not in proof that she had used such consumable property as merchandise. We must, therefore, conclude, as the doctrine of *Calhoun* v. *Fergeson* on this point, that a reasonable amount of the produce of the estate on hand at the death of the testator must be regarded as part of the estate as a whole, and accounted for only in the manner in which the estate, as a whole, is accounted for, and we cannot fail to conclude that if it had appeared in that case that the life-tenant had separated from the estate and sold or otherwise disposed of the produce left by the testator, or had allowed it to go to waste when it might have been sold, Chancellor Caldwell's decree would have ordered an account thereof. The Circuit decree in that case applies to the life-tenant the provisions of the act of 1789, (5 *Stat.* 111), as it regards finishing the crop incomplete at the death of the life-tenant. Such an application is eminently reasonable in view of the duty of the life-tenant's estate to turn over to the remainderman a reasonable amount of produce to maintain the future operations of the estate. But *Calhoun* v. *Fergeson* properly holds that the amount received by the life-tenant is not the measure of the amount required to be left, for that must depend upon the state and productiveness of the estate, for which the life-tenant is not necessarily responsible.

*Glover* v. *Hearst*, 10 *Rich. Eq.* 329. The result of that case is in harmony with the rule above stated, although the case does not assume to lay down the precise rule on the subject. The life-tenant received, at the death of the testator, a large amount of former produce of the estate, which must be assumed to have been largely in excess of the amount needed to carry on the estate. It was reasonable, therefore, that the life-tenant should be held

accountable for such excess, and so the court held in effect. The case, as it stood on the final appeal, was complicated by the fact that the Court of Appeals had, in a previous decision in the same case, held that the life-tenant was not accountable for the produce of the year in which the life-tenant died. The grounds of this conclusion do not appear, but as it was the law of the case the final decision had to be accommodated to it.

This led the court to say that it was unreasonable that the life-tenant should have the entire product of both years, and led to the conclusion that she must account for what was received by her at the death of the testator. It is clear that the court, in its final decision, did not intend to lay down any general rule. It cannot be affirmed that that case was decided upon the rule under consideration, but it is not inconsistent with the principles of that rule. It may be further contended that it was not the intention of the court to state the general rule of accountability in such cases, or to put forth that case as an illustration of the true rule. It should also be observed that there is a material difference between the rights of the life-tenant in that case and in cases of the class to which the present case belongs, as there the profits of the estate, over and above the maintenance of the estate and the support of the life-tenant, were directed to be accumulated for the benefit of the remainderman.

*Robertson* v. *Collier*, 1 *Hill Ch.* 370. In that case the life-tenant was held accountable for produce received at the death of the life-tenant, the consumable property being treated as convertible into a fund. It appears that the amount of produce received was large—upwards of $4000—and must be assumed to be largely in excess of what was required for use or consumption upon the estate. The question is not raised or discussed whether the life-tenant should be liable for as much of the produce on hand at the death of the testator as was requisite for the maintenance of the whole. The consequence is that the rule applied in that case, though not complete in its statement, is in harmony with that under consideration.

It must be concluded that the authorities in this state do not preclude the application of the rule above presented, which is recommended by its simplicity and reasonableness.

The matter of the various exceptions taken by the parties will next be considered.

The findings of the referee as to the annual value of the rental of Roselands appear to have been approved by the Circuit judge so far as they represented what would be a fair valuation as between parties standing on an equal footing. The Circuit judge, however, adds $100 per annum, on the principle of charging an executor with the highest rate who uses his testator's land "without having tested its rental value at public auction." Cases may exist where even a decree in equity may impose consequences in the nature of a penalty, but the present case is not appropriate for the exercise of that extreme function of equity. The executor had an election to take Roselands at a valuation to be fixed in the manner pointed out by the will. It is clear that the executor was not blamable for allowing his right of election to depend upon the result of a suit to settle the construction of the will, the various conflicts of right, and the precise mode of ascertaining such valuation. In the meantime there was a manifest propriety in the executor's retaining the cultivation of the estate in his own hands, leaving the question of the proper allowance, either by way of interest or rent, to be determined in the controversy. The determination of the referee appears to coincide with this view of the case, and should stand.

As the principal bill now before this court seeks a construction and execution of the will of Whitfield Brooks, it is competent that the conditions as to releasing contained in the tenth clause of the will should be carried into effect through the decree. If, therefore, the parties called upon to release have not effectually done so, either in form or by their answers, the decree should be so modified as to call for an election whether they will take under the tenth clause of the will of Whitfield Brooks, and release accordingly, and, in case of such election, should call for the releases provided for by that clause.

J. C. Brooks cannot be regarded as having taken a vested remainder in the lands devised to Mary P. for life, so that the judgments against him can have a lien on his interest in such lands. The direction is that at her death the lands shall be sold and the money divided. J. C. Brooks had nothing that he

could alienate, except as executor under the power contained in the will, and, therefore, there was nothing to which the lien of the judgments could attach. If it is assumed that the title to the land by way of remainder passed to the heir-at-law, and thus to J. C. Brooks as to his proportional share, subject to the execution of the power, still, as the execution of the power was one of the objects of the principal bill, the judgments cannot be regarded as having any lien as it regards the land. The creditors of J. C. Brooks must, therefore, so far as it regards the property claimed under the will of Whitfield Brooks, come in under the assignment of their debtor upon an equal footing, as upon assets made by a creditor's bill in equity. In the present will there are no words of conveyance under which J. C. Brooks could take a vested interest in the land as such. The disposition of the remainder after the death of the tenant for life is under the power of sale given by the will, and is absolute in its character. In such cases the recognized authority of a testator to convert land into money is regarded as fully exercised. *Fletcher* v. *Asburner,* 1 *Lead. Cas. Eq.* 497; *Wilkins* v. *Taylor,* 8 *Rich. Eq.* 291; *Mathis* v. *Guffin, Id.* 79.

There was no ground for dismissing the bill of the creditors of J. C. Brooks. The object of that bill, so far as that object can be accomplished at the present time, was to set up a trust, under the assignment of J. C. Brooks, for the benefit of his creditors. It is true that at law nothing passed under the assignment for want of an accepting assignee, and consequently of delivery. In equity, however, there was an inchoate trust which could be upheld and a trustee appointed. It is true that the assignment was an incident of a strictly legal proceeding, the defect of which equity cannot aid; still, the assignment was voluntary in the sense that it was not constrained or rendered necessary by law, but could be made or withheld, according to the will of the debtor. It is to be assumed that the motive that led the debtor to assign was that of obtaining a release from his debts. That end was not attained for want of compliance with the statute (4 *Stat.* 86) by an actual delivery to the assignee of the property assigned. *Wall* v. *Wardens,* 1 *Bay* 429. But the character of the assignment as the basis of the rights of creditors

in equity, at least, must be determined by the state of things that existed at its execution, and at that time, by such act of assignment, the debtor obtained substantial advantage as against his creditors, as it was not competent for any such creditor to obtain a lien on the property so assigned from and after the date of such assignment, so long as the debtor chose to pursue his remedy for a discharge. There was, therefore, a consideration for the assignment such as equity can notice, and the abandonment of the proceedings subsequently by the debtor could not affect the character obtained by the assignment at the time of its execution. If a different view was taken it would place it altogether in the hands of a debtor, with a conniving assignee, to bind or release himself at his pleasure, and thus to hinder, delay and defraud his creditors. The declaration of trust thus being a free act of the debtor, upon adequate consideration, is capable of being put in force by a court of equity, and the creditor's bill before the court is framed so that such remedy may be had under it. As a trust existed in equity, as between the assignee and the creditors beneficially interested, lapse of time is not a bar.

So much of the decree as declares that the children of General Dunovant should take the house and lot in Edgefield as part of their share should have provided for the equalization of the shares of such children with the other devisees upon the valuation of $5000 fixed by the will of Mrs. Brooks on such property. In taking the property the will intended that Mrs. Dunovant and her children should take as purchasers at the fixed valuation, the amount of their proportional share of the estate being determined by other provisions of the will, and they to be charged with the $5000 and credited with the amount of their distributable share, and the account adjusted accordingly. The contract of sale having been abandoned, and an election to take under the will having been made, the title passed by the words of the devise contained in the will, and it only remains to equalize the shares according to the direction of the will, and decree accordingly.

The assignments made to J. H. Brooks and J. E. Bacon should be upheld. The legal title of the assignor not having passed to the assignee under the assignment made by J. C. Brooks

for the benefit of his creditors for want of acceptance or delivery, it remained in him, (*Belden* v. *Pate*, 12 *Rich.* 358,) and his assignees, under subsequent assignments, took such legal title. The creditor's bill does not make J. E. Bacon a party, and does not make J. H. Brooks a party otherwise than as executor, and does not seek to set aside the assignments to J. H. Brooks and J. E. Bacon, nor is the question of the validity of such assignments a proper incident of the matter of either of the bills, but of an independent equity. The parties against whom this independent equity is asserted had a right to be impleaded in respect thereof, and to make a formal defence of the bar arising from the lapse of time. The course of proceeding in this respect tends to deprive them of this right. After so great a lapse of time, apparently sufficient to bar an equity of that character, and a failure to proceed formally for the enforcement of any equity they may possess, it should not be asserted in an informal and incidental manner to obtain a decree against the parties named.

Upon the principles already stated, it is clear that the proposition advanced in behalf of the executor of M. P. Brooks, that "the life-tenant should not be held accountable in any way to the testator's estate in remainder," is inadmissible.

Several objections have been raised to the decree as to the gift of $2000 by Mrs. Brooks to J. H. Brooks, shortly previous to her death, which will be considered together. There is a concurrence of conclusion between the Circuit judge who decided that question and the referee, that the delivery of the certificate of deposit to J. H. Brooks was intended as a gift. As that conclusion was inferentially drawn from somewhat vague statements made by Mrs. Brooks at the time of the alleged gift, the concurrence of the views of the Circuit judge and the referee should conclude this court, unless such conclusion violates some rule of law. The certificate must be assumed to be payable to bearer, and thus the delivery of the certificate would be a complete delivery of the money payable under it. There can be no doubt as to the sufficiency of the circumstances attending the gift, assuming it to be intended as a *donatio causa mortis* to maintain the character of such a gift. Such being the case, the devisees and legatees of Mrs. Brooks cannot avoid the gift. As the

insolvency of the estate is not alleged, the case is not in such a position that the question of the responsibility of J. H. Brooks for the whole or any part of this amount can be considered as affecting creditors. The decree is somewhat vague on this question, but should be construed in accordance with the conclusions just stated.

There is no error in the decree as it regards Turkey Creek plantation. The decree does not assume to define the exact interest of J. C. Brooks, nor whether that interest can be reached by his creditors.

The bill of the creditors of J. C. Brooks cannot be sustained as a general creditors' bill for the reason that it does not appear that the creditors have exhausted their remedy at law. *Holmes* v. *Ragsdale*, 1 *S. C.* 91. The only ground for maintaining that bill is to enforce the trusts of the assignment. The Turkey Creek place is not embraced in the assignment as to the interest of J. C. Brooks in that place—was not acquired until long after the assignment was made. The creditors filing the bill have no recourse thereunder against the estate of J. C. Brooks not embraced in his assignment. It was, therefore, unnecessary to define the exact interest of J. C. Brooks in that place as between himself and his creditors or children.

It appears by the report of the referee that Whitfield Brooks purchased negroes at the sale of the estate of Mrs. M. C. Carroll, deceased, part of which were originally purchased by J. B. La Borde and transferred to W. Brooks, and that after the death of W. Brooks, Mrs. Brooks paid for such purchases out of a legacy coming to her from the estate of Mrs. Carroll. The presumption is that these negroes thus purchased formed part of the estate of W. Brooks at his decease, and, therefore, passed under the clauses of his will. This, however, is unimportant. It is not disputed that the debt was a legal demand against the estate of W. Brooks, and was paid by Mrs. Brooks out of her individual estate; she is accordingly entitled to credit therefor. She is not entitled to interest on such payment, as she had the use of the property of the estate under the life-tenancy which was subject to the discharge of such debt. The referee is clearly in error in holding these negroes to be the property of Mrs. Brooks, on

the ground that they were not included in the inventory of the estate. They must be assumed to have formed part of the estate that went under the residuary clause to Mrs. Brooks as tenant for life. She was not bound to return an inventory of property held by her as life-tenant and not in the character of executrix. If such an inventory was in fact made it was unnecessary. The rights of the remainderman to demand an inventory depends upon an allegation of waste or the like. The inventory spoken of in *Devlin* v. *Patterson, McM. Eq.* 459, is clearly a specific inventory, distinct from that required of an executor as to property of his testator held in that character.

In *Robertson* v. *Collier*, 1 *Hill Ch.* 370, the inventory that may be required of a tenant for life of an estate in mass is spoken of as one of the remedies of the remainderman for the preservation of the property.

There is no evidence that Mrs. Brooks treated the slaves in question as her individual property, or in any way denied the rights of the remainderman in respect thereof. She is entitled to the credit claimed.

The decree is correct in not allowing to the estate of Mrs. Brooks money expended in keeping up the estate held by her in life-tenancy. It does not appear that the estate has received such enhancement of value as to give occasion for such an inquiry, but improvements made by the tenant for life cannot be charged against the remainderman unless special circumstances appear warranting such charge. No such circumstances appear in the present case, and the life-tenant must be regarded as having made a voluntary advance for the benefit of the estate and cannot claim reimbursement.

The exception that the referee erred in not charging the life-tenant's estate with the original inventory has already been disposed of and should be overruled.

The referee properly allowed for the difference in the value of the furniture and like property arising from natural and usual deterioration. The proof of such deterioration should come from the remainderman, and if such proof is deficient, as in this case, the life-estate cannot be charged.

The two slaves sold by the tenant for life do not appear to

have been disposed of to the detriment of the estate. The slaves are not to be regarded as the subjects of an independent specific devise and to be accounted for specifically. They formed part of the estate as a whole, and the whole question is disposed of by the finding that the estate was in a reasonably good condition at the death of the life-tenant. The question of emancipation need not, therefore, be considered as bearing on this question. There is no error in the decree as it regards the Blocker note.

The exception that J. H. Brooks should have been charged with the actual amount derived from Roselands is not well taken. The ground of this conclusion has already been specifically stated. It is not the case of an executor seeking to make a profit to himself out of the estate, but of a provisional management pending a controversy in which the executor had a personal interest as a beneficiary under the will.

It appears that commissions were allowed by the referee for years in which no returns were filed by J. H. Brooks, as executor. The decree is erroneous in this respect and should be corrected.

It is alleged that a clerical error occurred in the accounting that was overruled in the decree, in consequence of which the executor was allowed a credit in excess of the proper amount. The decree should be opened so far as to enable the Circuit Court to correct any clerical error that may be found.

The question of the crops of the year in which the life-tenant died has already been disposed of, and the exception of Dunovant and Lake as to that matter should be overruled.

The allowance of counsel fees is a matter belonging in a proper case to the discretion of the Circuit Court. The refusal of a judge at an early stage of a cause to allow counsel fees cannot control the judgment of the judge who hears the cause finally, nor is he bound by a previous order attempting to regulate in advance demands of that class, unless such order is in form or effect an agreement among the parties in the cause in a form binding on them.

The tenth exception of Dunovant and Lake has already been disposed of and should be overruled. The decree is entirely correct as it regards the credit for the amount paid to Mrs. Cor-

nelia Cross, and the reasons assigned by the Circuit judge therefor are satisfactory.

The exception charging the decree for allowing the life-tenant for the cabins and barns erected by the life-tenant is not well taken. There does not appear to be any such charge allowed by the decree. Permanent improvements put by the life-tenant upon the land go to the remainderman as part of the estate, and are to be considered under the general question as to the plight and condition of the estate, but are not the subject of specific allowance as against the remainderman. No account appears to have been stated in conformity with the final decree. When that account is stated the estate of the life-tenant should only be entitled to commissions as executor for the years in which returns were filed.

The fourteenth and fifteenth exceptions of Dunovant and Lake have already been considered and should be overruled.

The sixteenth exception of Dunovant and Lake should be overruled. It results from the conclusion already stated, that the life-tenant is not bound for furniture, plate and other articles of that class at the value when received by her, but only for deterioration improperly caused or permitted by her, and there is no proof of any such ground of charge.

The postponement of the charge of interest against J. H. Brooks, as executor, until the expiration of a year from his qualification, is not in violation of the established rules. The seventeenth exception should be overruled.

The decree, as it regards the account against J. H. Brooks, as executor, is correct in making the amount received by him as executor the basis of the account against him. The indebtedness of his testator is not his indebtedness as executor, the latter arising solely from the receipt of assets or neglect to call them in.

The eighteenth and twentieth exceptions of Dunovant and Lake are overruled, on the grounds already stated. As it regards the separate exceptions of Dunovant, no proper foundation is laid for the charges claimed by such exceptions, and they should be overruled.

The separate exceptions of Lake have already been disposed of and should be overruled.

The first and second exceptions of Mansfield are controlled by what has already been held, and should be overruled.

The payments made by J. H. Brooks, as executor to J. C. Brooks, were properly sustained. The assignment not having passed the legal title to J. C. Brooks' estate, J. H. Brooks could settle the interest of J. C. Brooks in the estate with no one but himself. The equity of the creditors, as it regards the interest of J. C. Brooks, can only follow that interest into the hands of J. C. Brooks, but cannot undo the legality of transactions between parties as it regards a party paying that which might have been recovered of him as between the immediate parties.

The fourth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth and fourteenth exceptions of Mansfield have been sufficiently considered and should be overruled.

The fifth misconceives the purport of the decree, and should be overruled.

The decree should be modified to conform to the foregoing conclusions.

Decree modified.


McIVER and HASKELL, A. J.'s, concurred.